# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# CASTAWAYS MANAGEMENT, INC., Respondent.

### No. 88–5349.

United States Court of Appeals, Eleventh Circuit.

April 24, 1989.

Aileen A. Armstrong, Howard Perlstein, Karen L. Arndt, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Joel I. Keiler, Reston, Va., for respondent.

Before KRAVITCH and HATCHETT, Circuit Judges and MARKEY *, Chief Circuit Judge.

---

* Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Donnelly served as acting manager of the motel's beverage department between November 15 and November 25, 1979. From November 25,

HATCHETT, Circuit Judge:

In this labor case, we find the evidence sufficient to support the National Labor Relations Board's order and enforce that order even though the employer's place of business no longer exists. Enforced.

## I. FACTS

In June, 1979, Castaways Management, Inc. ("Castaways") purchased the Castaways Motel at Miami Beach, Florida. In July, 1979, Castaways named Charles Rosen as the motel's general manager. At the time of purchase, the company employed 200 persons. The Hotel, Motel Restaurant and Hi–Rise Employees and Bartenders Union, Local 355, AFL–CIO (local 355), sought negotiations with Rosen, but Rosen did not respond to Local 355's requests. Shortly thereafter, Castaways stopped deducting Local 355 union dues from employees' paychecks.

In September, 1979, the Hotel, Resort Service Unions, Local 3, began soliciting Castaways's employees. Local 3 representatives spoke with motel employees and motel employee, Maximino Gil, distributed Local 3 literature and asked fellow employees to sign Local 3 authorization cards. Simultaneously, Rosen and Castaways's security chief, Dennis Keane, asked Local 355 representatives to stay off motel premises. On October 1, 1979, Local 3 petitioned the National Labor Relations Board (NLRB) for a representation election.

In early October, 1979, Rosen instituted plans to support Local 3. He enlisted James Donnelly, the motel's head bartender, as his primary ally.[1] Rosen conducted several strategy meetings with Donnelly, Keane, and Castaways's public relations manager, Larry Cliff. He instructed them to encourage employees to vote for Local 3 to improve working conditions. According to Donnelly, Rosen stated that if Local 3 won, "he could sign his own ticket because

1979, to April 3, 1980, he served as manager of the beverage department. During these periods, Donnelly acted as both Castaways's "supervisor" and "agent" pursuant to sections 2(11) and 2(13) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(11), 152(13) (West 1973).

the man who was president of Local 3 was a personal friend."

Beginning in December, 1979, Donnelly reported to Rosen daily. At Rosen's request, Donnelly discussed employees' union sympathies and supplied information that could be used to fire Local 355 supporters. Rosen instructed Donnelly to tell pro-Local 355 employees that voting for 355 could cost them their jobs. Rosen maintained a list, marking "355" or "X" next to the names of Local 355 supporters. At the same time, however, Donnelly helped Local 355's business agent, Buck Timperio, solicit authorization cards. Donnelly testified that he assisted Timperio to gain his confidence and to discover the identity of pro-Local 355 employees. Rosen approved of his actions.

In late December, 1979, Donnelly and Rosen began firing Local 355 supporters for asserted non-union related reasons. In early January, 1980, Rosen, without consulting Local 355, informed employees in the motel's bar (Wreck Bar) that they would receive a commission of fifteen cents on every drink sold. Donnelly told the bar waitresses that Rosen would revoke the commission if Local 355 won the election.

The National Labor Relations Board's Regional Director scheduled the election for January 31, 1980. In mid-January, 1980, Donnelly and Rosen increased pressure on motel employees by threatening them with demotions, pay reductions, working hour reductions, and possible transfers if they failed to vote for Local 3, or refused to vote on election day. Donnelly and Rosen became particularly concerned with a "clique" of pro–355 employees in the bar. On January 25, 1980, Local 355 filed a charge with the Regional Director of NLRB claiming that Castaways was improperly assisting Local 3. On January 29, 1980, the Regional Director postponed the election. In February, 1980, Donnelly and

Rosen fired all the bar clique members except one for non-union related reasons.

In March, 1980, instead of supporting Local 3, Rosen decided to persuade employees to vote against both locals. On March 21, 1980, Rosen fired Local 3 organizer Maximino Gil. This led to a stormy meeting between Rosen and Local 3 officer Armando Vazquez.[2]

One day before the election, Rosen told Donnelly to stop campaigning for Local 3 and to tell employees to vote against both locals. Donnelly complied with Rosen's request. On March 27, 1980, the employees voted. Thirty-nine employees voted for Local 355; three employees voted for Local 3; and fifty-two employees cast votes against representation by either union. Both unions filed unfair labor practice charges against Castaways.

## II. PROCEDURAL HISTORY

In November, 1980, the NLRB's General Counsel issued a complaint against Castaways based on violations of the following sections of the National Labor Relations Act ("the Act"): section 8(a)(1), 29 U.S.C.A. § 158(a)(1) (West 1973) (actions intended to dissuade employees from voting for Local 355); section 8(a)(1) and section 8(a)(2), 29 U.S.C.A. § 158(a)(2) (West 1973) (unlawfully supporting Local 3); section 8(a)(1) and section 8(a)(3), 29 U.S.C.A. § 158(a)(3) (West 1973) (discharging employees because of union activities); and section 8(a)(1) and section 8(a)(5), 29 U.S.C.A. § 158(a)(5) (West 1973) (granting employees a wage increase without bargaining with Local 355).

In August and November, 1981, an administrative law judge ("ALJ") tried the case. In September, 1982, the ALJ issued an order finding that Castaways illegally discharged eleven employees. Consequently, the ALJ ordered Castaways to reinstate the employees, award them backpay with

---

**2.** Vazquez testified:

I was really upset and excited. Here it is a week before the election, a day or so, and he's discharging a guy that was definitely one of my guys there in the hotel, helping me, to win the election.

So he knew that I was excited.

He said, 'Well, I'm getting a lot of pressure from Local 355, from Mr. Gonzalez.'

I said, 'What do I care about the pressure? What about my—why are you going to hurt me and help them by doing this? You are really giving me the business.'

interest, conduct a new election, and post notice of their violations on motel premises. In reaching the decision, the ALJ credited Donnelly's testimony and discredited Rosen's testimony.[3]

A three-member panel of the NLRB affirmed the ALJ's decision with modifications, finding nine illegal discharges instead of eleven. The NLRB panel found no basis for reversing the ALJ's credibility findings. *Castaways Management, Inc.*, 285 N.L.R.B. 121 (1987).

Several years ago, the Castaways Motel was demolished. No evidence exists, however, that Castaways is out of business. At oral argument, Castaways's counsel stated that he represented the company.

## III. CONTENTIONS OF THE PARTIES

Castaways contends that insufficient evidence exists to support the NLRB panel's conclusion that Castaways improperly discharged employees. Castaways supports this contention by arguing that the ALJ and the panel improperly credited Donnelly's testimony over that of Rosen. Castaways also contends the motel's destruction moots the panel's order.

The NLRB argues that this court should uphold the ALJ's and the panel's conclusions and credibility determinations because they are neither inherently unreasonable nor self-contradictory. The NLRB also contends that the panel's order is not moot because Castaways exists as a business entity.

## IV. ISSUES

The issues presented on appeal are: (1) whether sufficient evidence supports the NLRB panel's conclusion that Castaways violated sections 8(a)(1) and 8(a)(3) of the Act by discharging employees for union activity; and (2) whether demolition of the Castaways Motel renders the NLRB panel's order moot.

## V. DISCUSSION

### A. Sufficiency of the Evidence

Without Donnelly's testimony, Castaways contends, no evidence exists to support the conclusion that Castaways violated sections 8(a)(1) and 8(a)(3) of the Act.

#### 1. *Standard of Review*

As the court stated in *NLRB v. Varo, Inc.*, 425 F.2d 293, 296 (5th Cir.1970):

We are not to decide this case as if we were sitting as a super trial examiner or a super National Labor Relations Board. Rather, our obligation is to review the entire record with care to determine if there is substantial evidence to support the Board's findings and, if there is, to direct enforcement of the Board's order.

We give credibility determinations special deference. *NLRB v. Dixie Lime & Stone Co.*, 737 F.2d 1556, 1559 (11th Cir.1984). When conflicting evidence exists, "we are bound by the credibility determinations of the Board unless they are inherently unreasonable or self-contradictory." *Mead Corp. v. NLRB*, 697 F.2d 1013 (11th Cir. 1983). *Accord NLRB v. IDAB, Inc.*, 770 F.2d 991, 996 (11th Cir.1985); *Dixie Lime*, 737 F.2d at 1559. We cannot displace credibility choices even if we would justifiably have made a different choice *de novo*. *NLRB v. Southern Florida Hotel & Motel Association*, 751 F.2d 1571, 1579 (11th Cir. 1985) (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). *Accord Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1429 (11th Cir.1985); *Dixie Lime*, 737 F.2d at 1559.

#### 2. *Review of the Record*

The ALJ's findings depended "almost solely upon a determination of the veracity of the several witnesses of the General Counsel, as opposed to the several witnesses of the respondent." ALJ Decision at 21. The witnesses' stories conflicted in almost every respect. The ALJ resolved this con-

---

**3.** The ALJ stated:

As I observed [Donnelly] testifying, he most persuasively told it as though he was reliving the entire experience. If he were in fact un-

truthful, he was testifying on this occasion as very predominately truthful.

*Castaways Management, Inc.*, (Decision of Administrative Law Judge Sept. 30, 1982) at 24.

flict by considering a number of factors: the relationship of the witnesses to one another; the witnesses' responsiveness; the "non-selective, non-exaggerating, consistent and straightforward manner" in which each witness testified; and whether each witness's testimony related to the "logical consistency" of the record. ALJ Decision at 21. Using these factors, the ALJ credited Donnelly's testimony. The ALJ admitted that "Donnelly is not very sensitive to moral principles and moral integrity." The ALJ stated, however, that "perhaps his conduct can at least be understood on the premise, that as a matter of common knowledge some people will subvert principle and personal honesty to satisfy their employer with the hopes of securing their job standing with the employer." ALJ's Decision at 21. The ALJ further determined that, after Donnelly's employment at Castaways ended in April, 1980, Donnelly abandoned his loyalty to Castaways "and proceeded to tell it all." [4] ALJ Decision at 24.

Using the same factors, the ALJ discredited Rosen's testimony. The ALJ explained that "Rosen flatly denied essentially all testimony adverse to [Castaways's] interest." ALJ Decision at 22. See the Appendix for an illustration of Rosen's testimony.

■ Donnelly and Rosen presented conflicting accounts of events. The ALJ credited Donnelly. The ALJ described the factors that he used to make this decision and explained his reasoning. Further, corroborating testimony exists to support the ALJ's decision. The ALJ's credibility determinations were neither inherently unreasonable nor self-contradictory. Accordingly, we affirm the NLRB panel's decision to adopt these findings. Likewise, we affirm the NLRB's ruling that Castaways violated sections 8(a)(1) and 8(a)(3) of the Act.

### B. Mootness

■ Demolition of the Castaways Motel does not render the NLRB panel's order moot. No evidence exists that Castaways is out of business. It apparently compensates counsel; it can also compensate former employees with backpay. *See Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 107, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942) (termination of business "immaterial with respect to the backpay provision in the Board's order"). *See also NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir. 1984) (termination of employer's business does not necessarily render NLRB proceedings moot).

■ Some NLRB–ordered relief may not be feasible. For example, no motel exists in which to post notice. Similarly, no motel employees exist to hold an election. Lack of complete enforceability, however, does not preclude some enforcement. Because of public interest in discouraging unfair labor practices, "[a]llegations of impossibility of compliance have not prevented courts from enforcing Board orders against employers who have discontinued their business operations." *NLRB v. Great Western Coca–Cola Bottling Co.*, 740 F.2d 398, 406 (5th Cir.1984) (citing *Southport Petroleum*, 315 U.S. at 104–07, 62 S.Ct. at 454–56). Therefore, we enforce the Board's order. No evidence indicates that the Board will ask Castaways to perform impossible acts. *See NLRB v. Family Heritage Home–Beaver Dam, Inc.*, 491 F.2d 347, 351 n. 5 (7th Cir.1974); *NLRB v. Haspel*, 228 F.2d 155, 156 (2d Cir.1955). If it does, Castaways

---

4. At trial, Castaways tried to establish that it fired Donnelly because of a grand larceny charge to which Donnelly pleaded *nolo contendere*. Castaways sought to impeach Donnelly's credibility by introducing evidence of Donnelly's plea. Relying on the Federal Rules of Evidence, the ALJ correctly disregarded the proposed evidence.

> The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: ...
> Evidence of a final judgment, entered after a trial or upon a plea of guilty (*but not upon a plea of nolo contendere*), adjudging a person

guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused.

Fed.R.Evid. 803(22) (emphasis added). Further, the ALJ stated that "[e]ven if a conviction of Donnelly had been established, I nonetheless would remain persuaded that he was telling the truth on this occasion, as found herein." *Castaways Management, Inc.* (Errata to ALJ Decision Oct. 13, 1982).

may properly raise the impossibility defense in contempt proceedings. *See NLRB v. Colonial Knitting Corp.*, 464 F.2d 949, 952 n. 10 (3d Cir.1972); *NLRB v. Kostilnik*, 405 F.2d 733, 735 (3d Cir.1969).

## VI. CONCLUSION

Based on the above discussion, we hold that: (1) sufficient evidence exists to support the NLRB panel's conclusion that Castaways violated sections 8(a)(1) and 8(a)(3) of the Act; and (2) demolition of the Castaways Motel does not render the NLRB panel's order moot.

The order is enforced in full.

ENFORCED.

## APPENDIX

The following portion of Rosen's testimony illustrates the ALJ's statement that Rosen denied most testimony adverse to Castaways:

Q. Did you ever tell an employee that Local 355 is not doing anything for employees, and that you hoped that the employees voted for Local 3?

A. No, I did not.

Q. Did you every make a statement like this to any employees?

A. No, I did not.

Q. Did you every make that statement to Kathleen. Blenke?

A. No, I did not.

Q. Did you instruct your supervisors to tell employees that Local 355 could not do anything for the employees while Local 3 could?

A. I never said that.

Q. Did you give any instructions to your supervisors of a similar nature?

A. I did not.

Q. Did you ever tell your supervisors to tell employees that wage raises would be revoked if employees didn't vote for Local 3?

A. I never said that.

Q. Did you ever say anything like that to your supervisors?

A. I did not.

Rosen also testified that he did not care which Local won the election.

Q. Did you direct anybody else in the hotel to do any campaigning during the election?

A. Definitely not.

Q. Why did you do so little campaigning?

A. As a manager I don't think you have the right to. Having a contract for so many years, I believe I knew the area that I was allowed to discuss certain items in, and that area that I was not allowed to. Therefore, I stayed completely out of the picture as far as the election.

Q. Did you care who won?

A. Not particularly.

Other witnesses corroborated Donnelly's version of the facts and contradicted Rosen's version. Several examples stand out.

*Armando Vazquez*

Vazquez's testimony about his meeting with Rosen contradicts Rosen's statements that he did not care which local won the election. Vazquez testified:

I spoke to [Rosen] on the phone prior to this meeting, and I was complaining about Maximino Gil being discharged at the Castaway.

He told me, 'I don't want to discuss on the phone; come over.' So that's the reason that I went over to see him personally.

When I got there and I went into his office, I asked him why Max was discharged, Maximino Gil.

He knew that Maximino was one of our members, and what was the reason; why he would do that.

And that he knew that he was hurting me that way, and that—I used some foul language. I was kind of excited.

Rosen also remembered the meeting.

Q. Do you recall Mr. Vazquez calling you on the phone and asking you about Gil, 'I want you to come down. We don't discuss it on the phone. Come down here and we will discuss it in person.'

A. That's possibly how the conversation started, that I asked him to come down.

. . . .

Q. Did you say to him, 'I'm getting a lot of pressure because they know Gil is your right-hand guy here. I am getting a lot of calls, a lot of pressure, and I have got to score some points with Gonzalez.'

Did you say that or anything like that?

A. Words to that effect.

Q. Did [Vazquez] say, 'So to protect yourself and score points with Gonzalez you are going to f\_ \_ \_ me?'

A. Words to that effect.

*Kathleen Blenke*

Blenke corroborated Donnelly's testimony that he cautioned her about Rosen's threats. She also testified that Donnelly said Castaways would pay union dues if Local 3 won the election.

A. [Donnelly] said that he wouldn't vote if it was up to him. Mr. Rosen would be at the polls and he would know how we had voted.

He was going to watch us. Threaten all of us.

Q. What was said in this discussion, if anything, regarding the payment of dues.

A. That if Local 3 had won, that management would pay the dues for us.

Q. Who said this?

A. Jimmy Donnelly.

Q. Was anything said about how he knew that?

A. He said that Mr. Rosen said it to him.

*Joan Grinon*

Grinon's testimony confirms that this discussion took place.

Q. Where did you have this discussion with Mr. Donnelly?

A. At the Wreck Bar.

Q. What was the subject of the conversation?

A. About the union dues.

Q. What did Mr. Donnelly say to you? What did you say to him, if anything?

A. He said that Mr. Rosen told him that Local 3 would come in, the union dues would be paid by the hotel and that we would stop paying our union dues to Local 355.

Q. Was there anybody else present during this conversation?

A. Kathleen Blenke.

*Rhonda Reisler*

Reisler corroborated Donnelly's statements that he fired Blenke and Grinon on Rosen's orders because they supported Local 355.

Q. Do you recall having a discussion at any time with Mr. Donnelly about Miss Blenke and Miss Grinon?

A. Yes I do.

. . . .

Q. What did he say; where did this conversation occur?

A. Well, the conversation had occurred at a couple of places. It occurred at the Wreck Bar at night.

Q. And who was present during this conversation?

A. Just James Donnelly and I.

. . . .

Q. And what did he say to you and you to him if anything at that time?

A. He had told me that he had orders to fire Kathy and Joan because they were union, Local 355.

I had questioned about me because I was union at the time.

. . . .

Q. Please continue.

A. He stated that Charles Rosen had told him to figure out a way of how to get rid of Kathy and Joan.

. . . .

Q. Do you recall anything further?

A. Only that James Donnelly said that Mr. Rosen said that they could be damaging to the election by Kathy because she was a shop steward and Joan being a strong supporter.