**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED UNION OF ROOFERS, WATERPROOFERS AND ALLIED WORKERS LOCAL NO. 81, AFL–CIO, Respondent.**

**No. 89–70282.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 19, 1990.

Decided Sept. 27, 1990.

John D. Burgoyne, Assistant General Counsel, N.L.R.B., Washington, D.C., for petitioner.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for respondent.

Before WIGGINS and LEAVY, Circuit Judges, and STEPHENS *, District Judge.

LEAVY, Circuit Judge:

The National Labor Relations Board ("NLRB" or "Board") petitions for enforcement of its order that the United Union of Roofers, Waterproofers and Allied Workers, Local No. 81 ("Union") cease imposing fines and reinitiation fees on the employees who signed a petition rejecting the Union as their bargaining agent. The Board found that the Union's conduct in fining its members for signing the petition constituted an unfair labor practice under section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) (1988). We grant enforcement of the order.

## FACTS AND PROCEEDINGS

Beck Roofing Company ("Beck") is a California corporation engaged in the construction and reconstruction of roofs on a retail and non-retail basis. Beck employs between ten to eighteen workers depending on the season.

For thirty years, Beck and the United Union of Roofers have maintained a collective bargaining relationship. Beginning in early 1986, the employees began to discuss whether they would continue to work under a collective bargaining agreement after the current contract expired on August 1, 1986.

On the morning of May 16, 1986, Beck held a twenty minute meeting at the shop wherein Beck's office manager, Carol Merchant, announced to the employees that, in light of its financial condition, the company would either have to go nonunion or go out of business.

Joseph Martinez, a thirty-year Beck employee, decided during the meeting that he would leave the Union. After orally stating his position, Merchant advised Martinez that he would need to put his position in writing. In response, Martinez wrote out and signed the following document:

> We agree to do what ever is necessary to keep this Company from going belly-up and to keep people working on a competitive bidding program which is in actuality ... going nonunion. I therefore don't want the Union anymore.

Seven other employees signed the petition after Martinez indicated that they should do so if they wanted to stay with Beck. The petition was left on the secretary's desk throughout the day and weekend. On Monday morning, May 19, 1986, Martinez instructed the secretary to mail the petition to the Union, which she did.

On August 1, 1986, Beck went "nonunion." On that same day, the Union charged Martinez and three other signatories, Adam Cervantes, Albert Hill, and Steve Bussell, with disloyalty and gross disloyalty or conduct unbecoming a member for initiating and/or signing the petition, in violation of Article IX, Sections 7.(2) and 7.(4) of the Union's Constitution. Following a hearing, the four were found guilty as charged and were each fined $1,500 plus a $400 reinitiation fee in the event they sought to rejoin the Union. All but Bussell, who did not testify at the hearing, were notified of the imposition of the fine and the reinitiation fee.

Thereafter, Beck filed a charge with the NLRB claiming that the Union's discipline constituted an unfair labor practice in violation of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C.

* The Honorable Albert Lee Stephens, United States District Judge for the Central District of California, sitting by designation.

§ 158(b)(1)(A).[1] On February 17, 1988, the Administrative Law Judge ("ALJ") concluded that the Union's conduct in fining its members for initiating or supporting a petition to repudiate the Union constituted a prima facie violation of section 158(b)(1)(A). However, the ALJ also concluded that the petition was "tainted" by Beck's involvement and therefore the employees' action in initiating or signing the petition was not a protected activity under section 157: "[the four employees] did not decide freely and without coercion that they no longer desired the Union. Rather, they were manipulated by the Employer. Accordingly, their Section 7 rights were not affected by the Union discipline." The ALJ also found no violation of the Act with respect to Bussell for the "additional reason" that he was not "coerced" by the Union fine because he was not aware of it. On that basis, the ALJ recommended to the NLRB that the complaint be dismissed.

On May 26, 1989, the Board rejected the ALJ's recommendation. The Board found that the "employee-members were engaged in [section 157] protected concerted activity when they initiated and/or signed the petition, notwithstanding the Employer's involvement in it." The Board also found that the Union's violation of section 158(b)(1)(A) extended to Bussell even though he was unaware of the fine. Accordingly, the Board ordered the Union to cease and desist from the unfair labor practice and to rescind and refund the fines and fees imposed on the four employees.

On July 3, 1989, the Board filed this petition pursuant to 29 U.S.C. § 160(e) for enforcement of its order of May 1989.

## STANDARD OF REVIEW

We will uphold or enforce a decision of the Board if its findings of fact are sup-

ported by substantial evidence and if it correctly applied the law. *NLRB v. Howard Elec. Co.,* 873 F.2d 1287, 1290 (9th Cir.1989). "The Board's interpretation of the Act is entitled to deference and this court will uphold it if it is reasonably defensible." *NLRB v. United Ass'n of Journeymen & Apprentices,* 827 F.2d 579, 580 (9th Cir.1987).

## DISCUSSION

This appeal raises essentially three issues: (1) whether the Union's conduct in fining members who signed a petition rejecting the Union constitutes an unfair labor practice; (2) the effect of Beck's participation in the creation and signing of the petition on the charges against the Union; and (3) whether an unfair labor practice which is not disclosed to the affected member constitutes a violation of section 158(b)(1)(A).

## I. UNION DISCIPLINE

The Board found that the Union violated section 158(b)(1)(A) of the NLRA "when it imposed a fine and reinitiation fee on [the four] employees for their involvement in the petition." In reaching this conclusion, the Board relied on *International Molders' & Allied Workers Union, Local No. 125 (Blackhawk Tanning Co.),* 178 N.L.R.B. 208 (1969), *enforced,* 442 F.2d 92 (7th Cir. 1971).

In *Blackhawk Tanning,* the NLRB held that while a Union may lawfully *expel* a member for filing a decertification petition with the Board, it is an unfair labor practice for a union to *fine* an employee for filing a petition with the Board to decertify the union as the bargaining agent. In justifying the differing treatment, the Board stated the "union needs [the] power of ex-

**1.** Section 158(b)(1)(A) provides in pertinent part:

It shall be an unfair labor practice for a labor organization or its agents—
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with

respect to the acquisition or retention of membership therein. . . .
Section 157 provides in relevant part:
Employees shall have the right to . . . engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities. . . .

pulsion in order to defend its status as bargaining representative[,]"[2] *id.* at 208, while a fine "is not defensive and can only be punitive—to discourage members from seeking ... access to the Board's processes." *Id.* at 209. It is an unfair labor practice for a union to penalize its members because they have sought to invoke the Board's processes. *See NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968) (hereinafter *Marine Workers* ) (unlawful to expel or fine a member because he has filed an unfair labor charge with the Board).

The Union argues that the Board erred in applying *Blackhawk Tanning,* claiming that the Beck employees who signed the petition "had no intention and did contemplate invoking or utilizing the Labor Board procedures." As noted in *Blackhawk Tanning,* "[i]n a somewhat different context where the member's access to the Board was not involved, the Supreme Court has upheld the right of a union to *fine,* in lieu of expelling a member who crossed the picket line during [an authorized] strike." 178 N.L.R.B. at 208 (citing *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)).

The Union argues that the three-part test developed in *Allis-Chalmers* and *Scofield v. NLRB,* 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), for determining the lawfulness of internal union discipline should have been applied in this case. In *Allis-Chalmers* and *Scofield,* the Court held that, aside from barring enforcement of a union's internal regulations to affect a member's employment status, section 158(b)(1)(A) did not automatically prohibit internal union enforcement of union rules by fine and expulsion.

In *Scofield,* the Court developed a "dual approach" to determining the legality of a union's internal enforcement of its own rules. The Court held that "if the rule

invades or frustrates an overriding policy of the labor laws[,]" i.e., "the plain policy of the Act to keep employees completely free from coercion against making complaints to the Board[,]" then the rule may not be enforced, even by fine or expulsion, without violating section 158(b)(1). 394 U.S. at 429–30, 89 S.Ct. at 1157–58. Otherwise, section 158(b)(1)

leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule.

*Id.* at 430, 89 S.Ct. at 1158. Applying the three-part test, the Court held that the union rule, enforceable by fines and expulsion, imposing a ceiling on production did not contravene the policy of the NLRA and was therefore lawfully enforced.

■ We find that the Board applied the correct test in this case. The Board has reasonably determined that a union's action in fining a member who "seek[s] to decertify the union" violates "the public policy against permitting a union to penalize a member because he seeks the aid of the Board." *Blackhawk Tanning,* 178 N.L.R.B. at 209. *Blackhawk Tanning* has since been extended by the Board to protect employees who are merely "circulating a decertification petition" among certain employees. *See United Lodge No. 66, Int'l Ass'n of Machinists & Aerospace Workers,* 182 N.L.R.B. 849, 850 (1970). This expansion is consistent with the Supreme Court's statement that "[a]ny coercion used to discourage, retard, or defeat [access to the Board] is beyond the legitimate interests of a labor organization." *Marine Workers,* 391 U.S. at 424, 88 S.Ct. at 1721.

The record in this case does not disclose exactly what the employees "contemplated" doing with respect to the Board. However, it is clear the petition was designed to expel the Union, and that the

**2.** The Board explained that "[i]n the case of a decertification petition, the employee seeks to attack the very existence of the union as an institution. And unless the union can expel the member who seeks its destruction, 'during the pre-election campaign, the member could campaign against the union while remaining a member and therefore privy to the union's strategy and tactics.'" *Id.* (quoting *Price v. NLRB,* 373 F.2d 443, 447 (9th Cir.1967), *cert. denied,* 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968)).

collection of signatures was in fact a necessary step in the decertification process. In order to decertify a union as the bargaining representative, the Board must be presented with a petition accompanied by evidence of support from "a substantial number," at least thirty percent, of the affected employees."[3] *See* 29 U.S.C. § 159(c)(1)(A)(ii); 29 C.F.R. §§ 101.17, .18(a). In enforcing the Board's order in *Blackhawk Tanning*, the Seventh Circuit noted that

> [t]his procedure requires that the employees who are dissatisfied with the union take independent action and carry on a campaign for signatures. Since the initiative of employees and union members is needed for [section 159] to operate effectively, the circulation of a petition should be conducted in an atmosphere free from union threats and coercion.

*NLRB v. International Molders & Allied Workers Union, Local No. 125*, 442 F.2d 92, 95 (7th Cir.1971).

The Union argues that while "[i]t is true that the circulation of the employee petition could have lead to the invocation of [the Board's processes], that speculation ... is insufficient to sustain the Board's finding of an unfair labor practice." The issue, however, is not the actual implementation of the Board's processes, but the protection of activities directed at invoking the Board's processes, should that become necessary.[4] If those activities are not also protected, a union could easily avoid the Act's sanctions by penalizing the employee for his preliminary activities and thus "dis-

courage" or prevent him from ever approaching the Board. "To protect [section 157] concerted activities in full bloom, protection must necessarily be extended to intended, contemplated, or even referred to group action lest employer retaliation destroy the bud of employee initiative...." *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 (3d Cir.1969) (citation and quotation omitted), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). Accordingly, the Board properly found that the Union fine constituted an unfair labor practice under section 158(b)(1)(A).[5]

## II. EMPLOYER MISCONDUCT

■ It is undisputed that the petition in this case was "tainted" by Beck's involvement in procuring it.[6] The issue presented is whether the unlawful conduct of the employer nullifies the union's unfair labor violation. We agree with the Board that it does not.

In *Sheet Metal Workers' Int'l Assoc., Local Union No. 170 (Able Sheet Metal Prods., Inc.)*, 225 N.L.R.B. 1178 (1976), the Board reasonably concluded that a union "may not seek freedom to 'restrain or coerce employees in the exercise of their statutory rights merely because the Company may also have engaged in misconduct.'" *Id.* at 1181 (quoting *Communications Workers of Am., (Ohio Consol. Tele. Co.)*, 120 N.L.R.B. 684, 687 (1958), *enforced*, 266 F.2d 823 (6th Cir.1959), *aff'd as modified*, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960)). The Board held that it would not dismiss the complaint against

---

**3.** This "support is known as the 'showing of interest' and is necessary in order for the Board to begin processing the petition. Typically, a 'showing of interest' is evidenced by a petition signed by 30 percent of the affected employees but need take no special form as long as it shows the intent of the parties to no longer be represented by their union. The showing of interest must be filed within 48 hours of the filing of [the decertification] petition or the NLRB will dismiss the petition." 3 T. Kheel, *Labor Law* § 13A.04[2] (1989) (footnote omitted).

**4.** If the Union had contested the rejection in this case, the employees would probably have had to pursue the issue before the Board.

**5.** As we find the Union unlawfully inhibited its members' access to the Board, we need not

decide whether the Board also found a violation of the employees' right to free expression under the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a)(2).

**6.** It is an unfair labor practice "for an employer to initiate a decertification petition, solicit signatures for the petition, or lend more than minimal support and approval to the securing of signatures and the filing of the petition." *Eastern States Optical Co.*, 275 N.L.R.B. 371, 372 (1985) (footnotes omitted). An employer's withdrawal of recognition predicated on such a "tainted" petition will be held unlawful because, under those circumstances, the petition does not represent "the free and uncoerced act of the employees concerned." *Id.* (quotation omitted).

the union absent a showing that the employer engaged in the misconduct "with the intent of deliberately causing [the union] to commit an unfair labor practice" when it learned of the employees' activities. *Id.* The Board's finding that no such showing had been made by the Union in this case is supported by the record.

## III. BUSSELL'S KNOWLEDGE OF FINE

██ The ALJ found no violation of the NLRA with respect to Bussell because he was not notified of the fine, and therefore was not "coerced" by the Union.[7] The ALJ relied on the case of *Castaways Management, Inc.*, 285 N.L.R.B. No. 121 (1987), *enforced*, 870 F.2d 1539 (11th Cir.1989), which held that "[t]he mere issuance of instructions to supervisors to perform unlawful actions is not a violation [of NLRA] if those instructions are not carried out nor disclosed to the employees." *Id.* at 12 (citing *Resistance Technology, Inc.*, 280 N.L.R.B. 1004, 1006–07 (1986)).

The Board appropriately rejected the ALJ's conclusion with respect to Bussell. The Board found that the Union's violation of section 8(b)(1)(A) extended to Bussell because the Union actually "carried out the unlawful action" by conducting a trial and imposing a fine and reinitiation fee for his participation in the petition. Indeed, in *Castaways Management*, the Board found a violation because the supervisor *had* "carried out the [employer's] instructions." *Id.* Moreover, while the fine may not have "coerced" Bussell, it no doubt "coerced" or "restrained" all the other Beck employees who were aware of the discipline in the exercise of their statutory rights. Accordingly, we enforce the Board's order as to all disciplined employees.

ENFORCEMENT GRANTED.

---

**7.** The record shows that Martinez, Cervantes, and Hill each received two letters from the Union—one informing them of the charges against them, and another notifying them that they had been "found guilty as charged and assessed the sum of $1,500" for the violation.

Apparently, Bussell did not receive similar letters.

