**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**United Food & Commercial Workers Union, Local No. 126, Intervenor,**

**v.**

**Edwin R. O'NEILL, an individual; O'Neill, Ltd., et al., Respondents.**

**Nos. 90–70643, 90–70645.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1992.

Decided June 5, 1992.

**1524**

Paul Hitterman and Howard E. Perlstein, N.L.R.B., Washington, D.C., for petitioner.

Robert M. Cassel, Sullivan, Roche & Johnson, San Francisco, Ca., for respondents.

David A. Rosenfeld Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Ca., for intervenor.

Before: FLETCHER, D.W. NELSON, and FERNANDEZ, Circuit Judges.

D.W. NELSON, Circuit Judge:

## OVERVIEW

The National Labor Relations Board ("NLRB") petitions for enforcement of two of its orders. In case no. 90–70643, the NLRB petitions for enforcement of an order designed to compensate the Butchers' and Teamsters' Unions for unfair labor practices that occurred when Edwin O'Neill closed his meat plant in 1977 and then abruptly reopened it under the auspices of four new corporations just three weeks later. Case no. 90–70645 concerns unfair labor practices that resulted from the plant's permanent closing in 1981. O'Neill contends that the NLRB erred in holding that the unfair labor practices charges at issue in case no. 90–70643 were not time-barred, in finding that the new corporations were alter egos of the corporations formerly in existence at the plant, and in holding him individually liable for the un-

fair labor practices. We affirm the orders of the NLRB in both cases.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are long and complicated. The issues in this dispute all relate to the closing and subsequent reopening of a meat processing plant in Fresno, California, in 1977. O'Neill Meat Co. was formed in 1949 and Edwin O'Neill personally assumed control in the late 1960s. O'Neill owned 91% of the stock in O'Neill Meat Co.

In the mid 1970s, O'Neill Meat Co. began to experience severe losses. Accordingly, O'Neill decided to undertake an unpublicized reorganization of his company. O'Neill Meat Co. was renamed "Food Equipment Leasing Co." (hereinafter "FELC"). A wholly owned subsidiary of FELC entitled O'Neill Meat Company (hereinafter "OMC") was formed to operate the plant. OMC took responsibility for the production employees and union contracts formerly held by O'Neill Meat Co. Finally, a previously dormant corporation called O'Neill Ltd. was reactivated to assume the management functions of the plant.[1] Under the new organization, OMC leased the plant and its equipment from FELC and operated the plant; O'Neill Ltd. performed administrative and bookkeeping functions for OMC. All former FELC employees were also transferred to the payrolls of either OMC or O'Neill Ltd. O'Neill Ltd. became a holding company for FELC, holding 91% of its stock. The net result of this combined enterprise was an organization responsible for feeding and slaughtering cattle, and supplying beef to various stores in California.

At the same time that O'Neill was reorganizing his business, he began to rethink his relationship with the Butchers and Teamsters Unions. O'Neill had previously had a long and peaceful relationship with both unions. In 1975, however, O'Neill retained the services of a labor consultant. In February 1976, O'Neill allegedly threatened some plant supervisors with the loss

---

1. Edwin O'Neill owned 94% of O'Neill Ltd.

of their jobs if they did not resign their union memberships. In the fall of 1976, before the reorganization, O'Neill and the unions negotiated new collective bargaining agreements which called for yearly wage increases despite the company's growing financial problems. O'Neill also proposed a four-day workweek, but the unions refused to agree to the proposal.

Despite the reorganization, O'Neill's company continued to lose money in 1977. Accordingly, on October 26, 1977, O'Neill informed his employees that he intended to close the plant. O'Neill blamed his decision on both longstanding drought conditions and the cheaper labor that was available to meat processors in the Midwest.[2] By November 23, all employees had been laid off from the plant. O'Neill met with the unions on both November 8 and December 8 to discuss the effects of the plant closing.

At the December 8 meeting O'Neill and his representatives asserted to the unions that the plant closure should be considered permanent and that O'Neill had no intention of returning to the meat packing business.[3] When the union's attorney inquired if there was a possibility of leasing the facility, O'Neill's attorney responded that he was trying to arrange a lease, but in reality a lease between OMC and an entity called Fresno Beef Packers ("FBP") had already been executed on December 1. O'Neill's attorney also stated that the closing decision might be reconsidered if the Butchers were willing to make some concessions. However, on December 12, the plant did in fact reopen under the auspices of four new corporations.[4]

Each corporation handled a portion of OMC's former business. The FBP company was responsible for leasing the plant from FELC and slaughtering the cattle. The Don Turner Corporation (DTC) provided the labor used for slaughtering operations. The Sierra Pacific Meat Company (SPM) procured the cattle and brokered the finished product. The JET company transported the finished product using trucks leased from FELC. O'Neill Ltd. provided accounting and bookkeeping services, and yet another Edwin O'Neill-owned company, O'Neill Cattle Feeding Co. (OCF), supplied the cattle.

For the purposes of this discussion, several facts associated with the formation of the four new companies are significant. First, all were incorporated in late November and early December. Second, the owners of each company had previous relationships with both O'Neill and the meat plant. Third, all the companies had very small capitalizations, ranging from $1000 to $5000. Fourth, none of the companies secured a line of credit from a bank prior to the commencement of operations. Finally, the same lawyer handled the incorporation of three of the companies.

O'Neill and his representatives held another meeting with the Butchers on January 19, 1978. The Butchers inquired about the reopening of the plant and O'Neill's interest in the various companies. The facts are sketchy about what information was given to the union at this meeting, but it appears that O'Neill did not volunteer the information that he was involved with any of the companies. At that time, the Butchers also told O'Neill that they were filing a grievance against OMC over the plant's closing.

On April 12, 1978, the Butchers filed unfair labor practice charges (ULPC)

---

2. The NLRB argues that O'Neill's decision was prompted at least in part by his failure to obtain wage and workweek concessions from the unions.

3. The NLRB points to several pieces of evidence indicating that O'Neill did indeed know that the plant's closing would be brief. For example, ten days before the closing, the president of OMC instructed the plant superintendent to tell supervisors that they would be "taken care of." Salesmen were also instructed to tell customers that the plant would not be closed long.

4. Many of the employees hired for the new operation were former OMC employees. The employees were hired on the condition that they work on a non-union basis. Indeed, the NLRB found that one of the companies, the Don Turner Corporation, specified that no more than forty percent of its hires could be former OMC employees, so that the employees would be unable to vote the union back into the plant.

against OMC.[5] Following an investigation, the NLRB dismissed the charges because of a lack of evidence that O'Neill owned or controlled the new companies. The Butchers filed an appeal of the dismissal; the Teamsters did not. On October 5, 1978, the Regional Director of the NLRB received a letter from the Butchers stating that they had new information relevant to the previously dismissed charges.[6] On November 21, the Regional Director notified the parties that the Butchers' charges had been reinstated. On January 30, 1979, the Regional Director issued a complaint on the Butchers' charges, and on April 27, he issued an amended complaint that consolidated the Teamsters' and Butchers' charges.

On March 3, 1982, an administrative law judge issued his initial decision, finding that O'Neill and his companies had committed unfair labor practices by terminating and refusing to reinstate union members, by repudiating the union agreements in effect at OMC, and by refusing to bargain in good faith. On August 1, 1985, the NLRB remanded the case to the ALJ to determine whether the complaint should be dismissed as barred by a six-month statute of limitations because of the NLRB's 1985 decision in *Ducane Heating Corp.*, 273 NLRB 1389 (1985), *enforced*, 785 F.2d 304 (4th Cir.1986). The ALJ found that the statute of limitations had been tolled because of O'Neill's fraudulent concealment of the operative facts underlying his violations. On May 31, 1988, the NLRB adopted the ALJ's findings that the complaint was not time-barred and that O'Neill was the alter ego of all other respondents in the case and thus was individually liable for their unfair labor practices. This appeal for enforcement of the NLRB's orders followed.[7]

**5.** The Teamsters followed suit on May 11.

**6.** The key piece of information was an affidavit from a former company officer outlining O'Neill's involvement in the new corporations.

**7.** The plant ceased operations permanently on February 18, 1981. The Butchers again were not given the opportunity to bargain about the effects of this closing.

## STANDARD OF REVIEW

Decisions of the NLRB will be upheld on appeal if the NLRB's findings of fact are supported by substantial evidence and if it has correctly applied the law. *NLRB v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir.1989). "The substantial evidence test is essentially a case-by-case analysis requiring review of the whole record." *Turcios v. INS*, 821 F.2d 1396, 1398 (9th Cir.1987). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

## DISCUSSION

### 1. Timeliness of the Reinstated Charges

 Section 10(b) of the National Labor Relations Act ("NLRA") provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b).[8] In *Ducane Heating Corp.*, 273 NLRB 1389, the NLRB held that a dismissed charge may not be reinstated outside of the original six month statute of limitations period, unless the employer has fraudulently concealed material facts underlying the alleged violations. "Where there is fraudulent concealment, the limitations period begins to run when the charging party knows or should have known of the concealed facts." *Id.* at 1390. Thus, if a defendant has intentionally deceived a charging party with respect to the evidence necessary for the charging party to prove its case, *Ducane's* fraudulent concealment exception al-

**8.** As a preliminary matter, we note that the statute of limitations question is relevant only to our consideration of the first NLRB order, for which the NLRB seeks enforcement in No. 90–70643. This order dealt with the effects of the closing and reopening of the plant in 1977. The second NLRB order, the subject of docket No. 90–70645, was directed toward the effects of the final closing of the plant in 1981.

lows for reinstatement outside of the six month statute of limitations. In this case, the events giving rise to the unfair labor practices occurred in December 1977 and the charges were not reinstated until November 1978. O'Neill contends that the unions' charges are time-barred because the unions knew of the concealed facts at the latest by April 12, 1978, when they filed unfair labor practice charges. The NLRB responds that the statute of limitations was tolled until September 21, 1978, when the unions received the testimony of a recently-indicted company official that O'Neill was heavily involved in the new corporations.

The NLRB has not yet set out a definitive standard for what constitutes "fraudulent concealment of material facts." *International Ass'n of Machinists v. NLRB*, 949 F.2d 441, 449 (D.C.Cir.1991). In general, a party who wishes to invoke the doctrine of fraudulent concealment must establish "(1) fraudulent concealment by the party raising the statute [of limitations] together with (2) the other party's failure to discover the facts which are the basis of his cause of action despite (3) the exercise of due diligence on his part." *NLRB v. Don Burgess Constr. Corp.*, 596 F.2d 378, 383 n. 2 (9th Cir.) (citing *Charlotte Telecasters v. Jefferson–Pilot Corp.*, 546 F.2d 570, 574 (4th Cir.1976)), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). To establish the element of fraudulent concealment, the NLRB points to the finding below that "O'Neill's entire scheme was marked by efforts at concealing the operative facts regarding the closing and reopening of the meat plant." The NLRB also notes that O'Neill made misrepresentations at the December 8, 1977, meeting with the Butchers when he told them the closing was permanent and that the plant had not yet been leased. The Board also

argues that the deception continued when O'Neill's employees slid papers under the doors of offices to convey the impression that the businesses were separate and kept the office doors of the different companies locked.

We agree with the NLRB that the fraudulent concealment exception is applicable in this case. O'Neill's argument that the statute of limitations clearly began running on April 12 when the unions filed unfair labor practice charges is not persuasive. If the fact of filing charges were alone sufficient to trigger the statute of limitations, then there would be no need for the fraudulent concealment exception to *Ducane*. The relevant inquiry in deciding whether to allow reinstatement is not when the original charges were filed, but whether the defendant fraudulently concealed "the operative facts underlying the alleged violation." *Ducane*, 273 NLRB at 1390. In this case, substantial evidence supports the NLRB's finding that O'Neill repeatedly and fraudulently attempted to conceal the operative facts regarding the closing and reopening of the meat plant.[9] Moreover, O'Neill maintained his fraudulent course of conduct when he continued to obscure his substantial involvement in the operations of the new corporations. The fact that the NLRB initially dismissed the charges and reinstated them only after learning of the officer's testimony clearly indicates that the testimony was a critical and material piece of information. Because O'Neill fraudulently concealed material facts and because the unions themselves were diligent in filing and investigating their charges, we find that the unions' charges are not time-barred. *See Strawsine Manufacturing Co.*, 280 NLRB 553, 553 (1986) (finding a charge timely under *Ducane* because the employer had concealed facts

---

9. For example, O'Neill structured the new companies in such a manner as to convey the impression that he had no financial stake in their performance and no control over their activities, whereas in fact he remained the central figure in their operations. He also told the unions at the December 1977 meeting that he was going out of the meat packing business and that the new plant had not yet been leased, when he was at that time actively coordinating the formation of the new corporations and had already leased the plant. Furthermore, at the January 1978 meeting O'Neill again sought to deceive the unions by declaring, in direct response to a question put to him by one of the union attorneys, that he had no involvement with the new meat packing operations and thereafter continued to attempt to foster the illusion of separate entities.

about the closing of a plant). The statute of limitations did not begin running until September 21, 1978.

■ Because we conclude that the unions' case is not barred by *Ducane,* we next consider O'Neill's contention that a number of procedural defects bar application of the fraudulent concealment doctrine in this case. First, O'Neill contends that the NLRB was without authority to hear the complaint because the unions did not appeal the Regional Director's initial dismissal of their unfair labor practice charge or move for reconsideration before the General Counsel. This argument is without merit. 29 C.F.R. § 102.19(a) and (c) give the unions a *right* to appeal or move for reconsideration. They do not, however, preclude the General Counsel or the Regional Director from reinstating a charge on his own authority. *Pepsi–Cola Bottlers of Atlanta,* 267 NLRB 1100, 1106 n. 4 (1983) (failure to appeal dismissal did not bar reinstatement of new charge). In *Ducane,* for example, the Regional Director reinstituted *sua sponte* a complaint he had previously dismissed. The NLRB reversed on the grounds that the complaint was reinstituted after the period established by section 10(b). The Board clearly assumed, however, that the Regional Director had the authority to reinstate a charge on his own motion. *See California Pacific Signs, Inc.,* 233 NLRB 450, 451 (1977) ("once a charge has been timely filed, the control over, and disposition of, that charge is vested exclusively with the General Counsel pursuant to Section 3(d) of the Act. The General Counsel thus has virtually unlimited discretion to proceed on such timely filed charges as he deems fit").[10] The unions' failure to appeal or file a motion for reconsideration does not bar the General Counsel or the Regional Director from reinstating a complaint on their own motion.

■ O'Neill also contends that the ALJ and the NLRB should not have considered the issue of fraudulent concealment at all because it was not raised in the amended consolidated complaint or in the ALJ's first opinion. This argument also lacks merit. The General Counsel filed the amended consolidated complaint on April 27, 1979. The ALJ issued his initial opinion on March 30, 1982. *O'Neill,* 288 NLRB 1354, 1359 (1988) (reproducing ALJ slip opinion). At the time the complaint was filed and the opinion was issued, the NLRB did not require proof of fraudulent concealment in order to reinstate timely filed complaints. *California Pacific Signs, Inc.,* 233 NLRB 450 (1977). The ALJ relied on this case in concluding that the complaint was timely. *O'Neill,* 288 NLRB at 1381–83.

■ In 1985, the NLRB overruled *California Pacific* in *Ducane.* The NLRB then remanded this case to the ALJ for reconsideration in light of *Ducane.*[11] On remand, the parties briefed the issue of fraudulent concealment and entered into a stipulation of the facts relating to O'Neill's fraudulent concealment. Based on this evidence, the ALJ found that O'Neill had fraudulently concealed facts from the unions and the General Counsel, and that the time limit of section 10(b) was therefore tolled until the true facts were discovered.

It therefore appears that the General Counsel presented evidence and argument on the issue of fraudulent concealment as soon as the issue arose—that is, in 1985. The ALJ did in fact make findings on the issue in his supplemental decision. O'Neill's assertion that no such evidence was presented is flatly contradicted by the record. We therefore conclude that the NLRB is entitled to have this court consider its fraudulent concealment arguments on the merits.

■ Finally, O'Neill contends that the charges against him as an individual should

---

**10.** *California Pacific* was overruled in *Ducane* insofar as it held that the General Counsel had discretion to exceed the time limits imposed by section 10(b). However, *Ducane* did not strip the General Counsel of his power to reinstate charges on its own motion within the six month limit of section 10(b).

**11.** *Ducane* is retroactive, and therefore applies in this case even though it began long before *Ducane* was decided. *International Ass'n of Machinists,* 949 F.2d at 448–49.

be dismissed because he was not added as a party until January 22, 1979, more than six months after the violations occurred. We reject this argument as well. In the first place, the ALJ found that Edwin O'Neill and the corporations charged in the first complaint were alter egos. *O'Neill,* 288 NLRB at 1378. Where two parties are alter egos, service on one is sufficient to initiate proceedings against both within the statute of limitations. *BMD Sportswear Corp.,* 283 NLRB 142, 142 n. 1 (1987); *Sturdevant Sheet Metal & Roofing Co.,* 238 NLRB 186, 187 (1978), *enforced,* 636 F.2d 271 (10th Cir.1980); *see also Associated Gen. Contractors v. NLRB,* 929 F.2d 910, 915 (2d Cir.1991) (derivative liability may be imposed on alter egos "without regard to the fact that the limitations period has expired").

In any event, the NLRB clearly made findings that O'Neill individually engaged in fraudulent concealment, thereby tolling the statute of limitations until September 21, 1978. *O'Neill,* 288 NLRB at 1355. Even if the section 10(b) limitations period did apply to O'Neill as an individual, therefore, the period is tolled because of O'Neill's fraudulent concealment.

### 2. Finding of Alter Ego

The ALJ and the NLRB both found that prior to November 1977 OMC, O'Neill Ltd., and FELC constituted a single employer operating the O'Neill meat plant. Furthermore, they found that the post-November corporations of SPM, FBP, JET, and DTC were the alter egos of this single employer. Moreover, they concluded that the new entities were created in an attempt to circumvent O'Neill's obligations to the unions. Therefore, the Board found that O'Neill and his companies constituted a single employer liable for the unfair labor practices committed in conjunction with the initial closing, reopening, and the eventual permanent closing of the plant.

■ " 'The focus of the alter ego test … is on the existence of a disguised continuance of the same business or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Haley & Haley v. NLRB,* 880 F.2d 1147, 1149–50 (9th Cir.1989) (quoting *Dariano & Sons, Inc. v. District Council of Painters No. 33,* 869 F.2d 514, 518 (9th Cir.1989). We consider four factors in determining whether entities are alter egos of one another: "(1) centralized control of labor operations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control." *J.M. Tanaka Constr. Inc. v. NLRB,* 675 F.2d 1029, 1033 (9th Cir.1982). No factor is controlling and all need not be present. "In addition, the determination that one entity is merely another's alter ego will depend to some extent on whether or not the transfer of assets or the dissolution of the old entity is motivated by union animus." *Haley,* 880 F.2d at 1150. Finally, "[a] conclusion by the Board that two corporations are alter egos is essentially factual and may not be disturbed if, looking at all the evidence, substantial evidence supports the determination." *Tanaka,* 675 F.2d at 1033.

■ The single most important factor in the analysis is centralized control of labor relations. *Id.* at 1034. As evidence that O'Neill controlled the labor relations of the four new corporations, the NLRB points to the facts that O'Neill instructed two former OMC employees to work for one particular corporation, that he directed an FBP engineer to make certain changes to the plant, and that he recruited the new general manager for SPM. In terms of relationships with the unions, the NLRB found that O'Neill Ltd.'s vice-president authorized raises for SPM staff, instructed the SPM general manager to lay off DTC staff, and that O'Neill himself made efforts to pressure the Butchers to stop picketing an SPM customer. Finally, the NLRB points out that former OMC employees who had angered management were not hired to work for any of the new companies upon reopening. These facts suggest that at least some control of labor relations was centralized in O'Neill.

As for common management, the NLRB found that O'Neill arranged for the lease

of SPM's offices and resolved a dispute between an OMC and a DTC supervisor about laying off employees. Other O'Neill Ltd. employees ordered supplies for SPM, provided credit references for FBP, and monitored operations at the plant by preparing daily reports on operations. The NLRB also states that O'Neill Ltd. handled all of SPM's financial affairs. Some of the companies' managers also displayed very little interest in or involvement with their companies; the SPM manager did not even hire his own staff. Although this seems to constitute some evidence that O'Neill was at least involved with the management of plant operations, it does not seem to rise to the level of substantial evidence of control of the daily operations of the plant. *See Tanaka*, 675 F.2d at 1034 (finding alter ego in part because of shared control of daily operations). This factor standing alone would not seem to constitute substantial evidence that the businesses were alter egos.

However, the third factor, interrelation of operations, very strongly supports a finding of alter ego. The owner of SPM stated that O'Neill told him the companies evolved out of one another and were all dependent on each other. The companies leased equipment from one another, supplied each other with both raw materials and finished product, and in part operated out of the same facility.

In terms of the fourth factor, it is undisputed that O'Neill did not own any of the new companies and did not serve as an officer for any of them. However, all of the new companies had extremely thin capitalizations and O'Neill supplied one of them with nearly two million dollars worth of cattle without demanding payment. O'Neill also negotiated a line of credit for SPM and personally guaranteed its indebtedness. O'Neill also guaranteed FBP's lease payments and transferred money between various company accounts as needed. Moreover, FELC leased trucks to JET without requiring a security deposit and unilaterally raised lease payments at will. O'Neill's demonstrated control of financial operations also strongly supports a finding of alter ego.

In response, O'Neill vigorously contests certain of the NLRB's factual findings relating to O'Neill's control of labor relations and the issue of centralized management, such as the circumstances surrounding the hiring of SPM general manager Burratto. O'Neill also argues that his company supplied only twenty-one percent of the beef that flowed through the new corporations during the first year, and thus it is unreasonable to believe the corporations existed solely for O'Neill's benefit. However, even eliminating the evidence relating to labor relations and centralized management, we believe that the evidence of interrelationship of operations and financial control, coupled with the unusual circumstances surrounding the corporations' formation, the evidence that OMC principals knew the plant closure would be brief, and the evidence of hostility toward labor, constitutes substantial evidence sufficient to support a finding of alter ego. The companies were undisputably intermingled and controlled to a significant extent by O'Neill and his original companies (OMC, O'Neill Ltd. and FELC). We affirm the NLRB's finding on alter ego because it is supported by substantial evidence.

### 3. Piercing the Corporate Veil

As discussed above, the ALJ and the NLRB concluded that the four corporations that reopened the meat packing plant were alter egos of the O'Neill enterprises that had previously operated the plant. However, they also found that Edwin O'Neill individually was the alter ego of all seven corporations and thus was personally liable for the unfair labor practices. Because the other companies are apparently now out of business, this means that Edwin O'Neill is personally responsible for satisfying what is by now a very substantial backpay award. Not surprisingly, O'Neill vigorously contests the NLRB's decision to pierce the corporate veil.

The finding that the four new corporations were alter egos of the old corporations created to avoid OMC's collective bargaining obligations does not answer the

question whether O'Neill himself should be individually liable. We begin our analysis of this separate question with the principle that "[s]ection 10(c) of the Act empowers the Board with broad authority to fashion appropriate remedies to meet the needs of a particular situation so that 'the victims of discrimination may be treated fairly.'" *Greater Kansas City Roofing*, 305 NLRB No. 89, at 1 (Nov. 25, 1991) (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Although "insulation of a stockholder from the debts and obligations of his corporation is the norm," there are exceptions to this general principle. *NLRB v. Deena Artware*, 361 U.S. 398, 402–03, 80 S.Ct. 441, 443, 4 L.Ed.2d 400 (1960). We examine three factors in deciding whether to pierce the corporate veil: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited upon the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators. *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir.1979).

▌ It is clear that the second and third factors are satisfied in this case. O'Neill concedes that if he is not found individually liable the alleged discrimination will go unremedied. Moreover, because we concluded above that the companies were alter egos created to avoid collective bargaining obligations, the conclusion that the companies were created and incorporated with fraudulent intent is inescapable.

The evidence on lack of respect given to the separate identity of the corporation is more problematic. The NLRB does not claim that O'Neill mingled personal and corporate monies or treated any of the corporation's assets as his own, which often constitutes the most serious evidence of disregard of the corporate form. *See, e.g., Seymour*, 605 F.2d at 1112. Moreover, the corporations did have officers and keep corporate records, which suggests the companies followed some corporate formalities. However, in other respects O'Neill showed little regard for the corporate form. He moved officers from one company to another, made decisions in the absence of board meetings, and sometimes failed to inform company directors that decisions had been made. He also personally guaranteed loans and clearly was involved in the decisionmaking processes of all the companies.

"When the incentive value of limited liability to corporations and their owners is outweighed by the competing values of basic fairness to parties dealing with a corporation, the Board should look past that corporation's formal existence and hold controlling individuals liable for 'corporate' obligations." *Greater Kansas City Roofing*, 305 NLRB No. 89, at 1. Other courts have recognized and endorsed the NLRB's policy of holding an individual personally liable for unfair labor practices when that individual participated in the decisionmaking that caused the ULP outside of the normal channels of corporate control. *See, e.g., Esmark, Inc. v. NLRB*, 887 F.2d 739, 757 (7th Cir.1989). "The corporate veil will be pierced whenever it is employed to perpetuate fraud, evade existing obligations, or circumvent a statute. Thus, in the field of labor relations, the courts and Board have looked beyond organizational form where an individual ... was in active concert or participation in a scheme or plan of evasion...." *Riley Aeronautics Corp.*, 178 NLRB 495, 501 (1969). Because O'Neill was the driving force behind the creation of the different corporations, created the corporations with fraudulent intent and in an effort to avoid his labor obligations, and continued to participate actively in their operations, piercing the corporate veil in this case is justified.

### CONCLUSION

The orders of the NLRB will be ENFORCED.