20 F.3d 1017
 146 L.R.R.M. (BNA) 2009, 62 USLW 2672,
127 Lab.Cas. P 11,070
 NATIONAL LABOR RELATIONS BOARD, Petitioner-Cross-Respondent,
The Atchison, Topeka & Santa Fe Railway Company, Petitioner-Intervenor,
v.
GENERAL TRUCK DRIVERS, WAREHOUSEMEN, HELPERS AND AUTOMOTIVE
EMPLOYEES OF CONTRA COSTA COUNTY, LOCAL NO. 315,
Respondent-Cross-Petitioner.
 No. 92-70417.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 15, 1993.
Decided April 1, 1994.
 
 Aileen A. Armstrong, Fred L. Cornnell, N.L.R.B., Washington, DC, for petitioner-cross-respondent.
 Ronald W. Novotny, Hill, Farrer & Burrill, Los Angeles, CA, for petitioner-intervenor.
 Duane B. Beeson, Beeson, Taylor, Silbert, Bodine & Livingston, San Francisco, CA, for respondent-cross-petitioner.
 On Application for Enforcement and Cross-Petition for Review of an Order of The National Labor Relations Board.
 Before: WALLACE, Chief Judge, GARTH* and WIGGINS, Circuit Judges.
 GARTH, Circuit Judge:
 
 
 1
 The National Labor Relations Board ("Board") petitions for enforcement of its order against General Truck Drivers, Warehousemen, Helpers and Automotive Employees of Contra Costa County, Local No. 315, affiliated with International Brotherhood of Teamsters, AFL-CIO ("Union"). The Atchison, Topeka & Santa Fe Railway Company ("Santa Fe") intervened in support of the Board.
 
 
 2
 In its cross-petition for review, the Union contends that the Board erred in holding that the Union violated the secondary picketing proscriptions of sections 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act ("Act"), 29 U.S.C. Secs. 158(b)(4)(i) and (ii)(B), by engaging in common situs picketing and handbilling activities conducted with the object of enmeshing Santa Fe and other neutral employers in the Union's dispute with the primary employer.
 
 
 3
 We find that the Board applied the proper standard for assessing the Union activity, and that substantial evidence supports the Board's findings that the Union violated the secondary picketing provisions of the Act. We, therefore, will enforce the order of the Board, and deny the Union's cross-petition for review.I.
 
 
 4
 The facts of this case are not in dispute. The Union was engaged in a primary labor dispute with Piggyback Services, Inc., a non-union employer. The dispute erupted after Santa Fe awarded Piggyback a subcontract to ramp and deramp intermodal freight[1] at Santa Fe's Richmond, California rail terminal. That work previously had been performed by union members for a wholly owned subsidiary of Santa Fe. When Piggyback allegedly reneged on its promise to hire the former union workers in July 1990, the Union began picketing and distributing handbills at Santa Fe's Richmond rail terminal.
 
 
 5
 In an effort to insulate itself from the Union's labor dispute with Piggyback, Santa Fe designated a gate, Gate 1, as the sole entrance to the Richmond facility for employees, customers, visitors and suppliers of Piggyback. Santa Fe also posted signs at four other entrances to the Richmond facility, designated as Gate 2, Gate 3, Gate 4, and Gate 5, stating that these "neutral" gates were reserved for the exclusive use of Santa Fe's employees, customers, visitors and suppliers, and that Gate 1 was available only for Piggyback's employees, customers, visitors and suppliers.
 
 
 6
 Although Piggyback employees entered only through Gate 1, and the Union fully acknowledged that it had no labor dispute with Santa Fe, the Union began picketing at the four "neutral" gates. The Union also picketed a fifth neutral gate, Gate 4(b), which was not posted and which was used by Santa Fe's employees to enter and exit the railyard; Santa Fe closed Gate 4(b) after only one day. Much of the Union's picketing commenced after Santa Fe, apparently for safety reasons, declined the Union's request to picket inside the railway yard where Piggyback employees worked.
 
 
 7
 Handbills distributed by the Union at neutral locations urged neutral employees and customers entering the Santa Fe railway yard to either honor the picket line or, alternatively, to cease all work related to Piggyback's day-to-day operations. The Union sent letters to the presidents of the seven unions which represented Santa Fe employees; the letters requested that union members employed by Santa Fe not perform work directly related to Piggyback's operations at the Richmond terminal. A similar letter was sent by the Union to United Parcel Services (UPS), Santa Fe's primary unionized intermodal trucking customer.
 
 
 8
 The union-represented truck drivers of UPS and other Santa Fe customers honored the picket line by refusing to deliver intermodal freight to the Richmond terminal. In response, Santa Fe established a drop-off site about a mile-and-a-half from Gate 3, for use by UPS and other Santa Fe customers. Although no Piggyback employees were stationed at the UPS drop-off site, the Union expanded its activity to that location. The Union also picketed at two railroad spurs, designated as the West Switching Lead and the Zone 3 Industries, where intermodal freight cars entered the railway yard.
 
 
 9
 Santa Fe notified the Union that its picketing was unlawful, and that it had filed unfair labor practice charges against the Union. While denying the charges, the Union acknowledged that it was requesting Santa Fe employees not to perform work directly involved in the day-to-day operations of Piggyback Services. Following issuance of a temporary restraining order, all Santa Fe employees returned to work on August 27, 1990.
 
 
 10
 Applying the standards of Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547, 549 (1950), the Board affirmed the conclusion of the administrative law judge (ALJ) that the Union activities violated the secondary boycott provisions of the Act, 29 U.S.C. Secs. 158(b)(4)(i) and (ii)(B). Specifically, the Board found that the Union's activities were conducted with the object of enmeshing Santa Fe and other neutral employers in the Union's dispute with Piggyback by picketing unlawfully at Gates 2, 3, 4, 4(b), 5, at the West Switching Lead and the Zone 3 Industries spurs, and at the UPS drop-off point. Accordingly, the Board approved with minor modification the ALJ's order prohibiting the Union from engaging in any picketing and handbilling activity with an object of forcing neutral employers to cease doing business with Santa Fe, and of forcing Santa Fe to cease doing business with Piggyback.[2]
 
 
 11
 We must uphold decisions of the Board if its findings of fact are supported by substantial evidence and if the Board correctly applied the law. N.L.R.B. v. O'Neill, 965 F.2d 1522, 1526 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2995, 125 L.Ed.2d 689 (1993). " 'The substantial evidence test is essentially a case-by-case analysis requiring review of the whole record.' " Id. (quoting Turcios v. INS, 821 F.2d 1396, 1398 (9th Cir.1987)). We defer to the Board's interpretation of the National Labor Relations Act " 'if it is reasonably defensible.' " N.L.R.B. v. United Union of Roofers, Waterproofers & Allied Workers, Local 81, 915 F.2d 508, 510 (9th Cir.1990) (citation omitted).
 
 II.
 
 12
 Section 8(b)(4)(B) of the Act prohibits secondary boycott activities calculated to embroil neutral employers and employees in a union's dispute with the primary employer.[3] A union may picket a primary employer at a job situs under the control of a secondary employer only if the picketing is primary in nature. Iron Workers Dist. Council, Local 29 v. N.L.R.B., 913 F.2d 1470, 1475 (9th Cir.1990); N.L.R.B. v. Ironworkers Local 433, 850 F.2d 551, 554 (9th Cir.1988). An employer, of course, is entitled to establish separate gates for the use of primary and neutral employers. So long as the "neutral" gate is used only by neutral employees or suppliers, a union cannot picket at that gate and must confine its activities exclusively to the gate reserved for the primary employer's use. Local 761, Int'l Union of Elec., Radio & Mach. Workers v. N.L.R.B. (General Electric), 366 U.S. 667, 680-81, 81 S.Ct. 1285, 1293, 6 L.Ed.2d 592 (1961). Conversely, a substantial mixed use of a "neutral" gate by primary and secondary employees or suppliers compromises the gate's neutrality, thereby permitting union picketing. Id. at 681-82, 81 S.Ct. at 1293-94; Local 76 of Int'l Bhd. of Elec. Workers v. N.L.R.B., 742 F.2d 498, 501 (9th Cir.1984).
 
 
 13
 As a means of distinguishing between primary and secondary boycotts, the Board in Moore Dry Dock established a four-part test for determining whether union picketing at a common situs, where both primary and secondary employers are performing work, is a lawful exertion of pressure against a primary employer or is an unlawful secondary boycott. As we understand the Moore Dry Dock doctrine, any one of the following four criteria, if violated, can give rise to a rebuttable inference that the Union is engaged in a secondary boycott. By the same token, a union acts within permissible bounds if: (1) the picketing is limited to times when the situs of the dispute is located on the secondary employer's [Santa Fe's] premises; (2) at the time of the picketing the primary employer [Piggyback] is engaged in its normal business at the situs; (3) the picketing is limited to places reasonably close to the location of the situs; and (4) the picketing discloses clearly that the dispute is with the primary employer [Piggyback]. 92 N.L.R.B. at 549. In this case, the only one of the four Moore Dry Dock criteria which the Union was found not to have complied with, and which the Union challenges, is the third criterion; that "the picketing is limited to places reasonably close to the location of the situs." The Board, as we discuss infra, found that the Union had not refuted the inference that its picketing objective constituted a secondary boycott.
 
 A.
 
 14
 The Moore Dry Dock standards for common situs picketing were explicitly approved by the Supreme Court in General Electric. 366 U.S. at 680-81, 81 S.Ct. at 1293. General Electric teaches that pickets at the primary employer's premises may directly appeal to secondary employees if, but only if, the work of those secondary employees is related to the work done by the struck primary employer. Under the General Electric rule, secondary employees delivering goods to or from the primary employer, and secondary employees doing maintenance work necessary for the operation of the struck plant, are engaged in related work. The General Electric Court established this new test to determine whether a union could picket at a gate utilized exclusively by employees of independent contractors who worked on the struck employer's premises. The Court determined that the key to a union's right to picket at a particular gate is the type of work performed by those using it. Id. Where a separate gate on the property of the primary employer is used both by secondary employees doing related work and by secondary employees doing unrelated work, the gate will be deemed mingled. Under such circumstances, a union can station pickets at the mingled gate without violating the Moore Dry Dock standards, unless the use by secondary employees doing related work is de minimis.
 
 B.
 
 15
 This "related work" rule was later expanded by the Court in United Steelworkers of America, AFL-CIO v. N.L.R.B. (Carrier), 376 U.S. 492, 498, 84 S.Ct. 899, 903, 11 L.Ed.2d 863 (1963). In Carrier, the Court found picketing lawful at a special railroad spur track, located contiguous to the primary employer's property, but owned by and reserved for employees of the neutral railroad to enter the primary employer's property to make deliveries and pick up shipments. The Carrier Court identified "[t]he location of the picketing as an important but not decisive factor." Id. at 499, 84 S.Ct. at 904. Because there was no other place where the union in Carrier could have brought home its dispute with the primary employer, the Court determined that "[f]or the purposes of Sec. 8(b)(4) picketing at a situs so proximate and related to the employer's day-to-day operations [such picketing] is no more illegal than if it had occurred at a gate owned by [the struck employer]." Id. at 500, 84 S.Ct. at 904.
 
 III.
 
 16
 We hold that the Board correctly determined that the "related work" doctrine of General Electric and Carrier has no application in this case, where the picketing occurred at premises neither owned by the primary employer nor proximate to the primary employer's premises, and that the Moore Dry Dock criteria govern this case.
 
 
 17
 The Union acknowledges that its picketing and handbilling activity at Santa Fe's Richmond terminal occurred at gates which were posted against use by Piggyback's employees, customers, visitors and suppliers. The Union contends, however, that the interdependency between the operations of Piggyback and Santa Fe justified the Union's appeal to "neutral" employees and customers of Santa Fe not to work with Piggyback employees in the performance of Piggyback's normal day-to-day operations.
 
 
 18
 As this case illustrates, the line between primary and secondary boycotts is often blurred in a common work situs situation, especially where, as here, the work of the primary and neutral employees is largely integrated. In order to perform duties essential to Piggyback's operation, Piggyback employees had to remain in constant communication with Santa Fe's employees. Approximately 40% of the rail freight traffic at Santa Fe's Richmond terminal is exclusively intermodal freight, which is freight transported in vans. Piggyback uses heavy equipment supplied by Santa Fe to remove these vans from the flatcars. The vans used to transport intermodal freight are brought to and from the rail yard in trucks owned and operated by Santa Fe's customers and independent truckers employed by Santa Fe. None of these Santa Fe customers and truckers has any contractual relationship with Piggyback, although each must stop at a checkpoint manned by Piggyback employees, who weigh and inspect the vans for damage and perform other procedures necessary to the intermodal freight rail transport process.
 
 
 19
 The Union argues that because the work of Santa Fe's admittedly neutral employees and customers was necessary to the normal operation of Piggyback's business, the Union's picketing and handbilling at the reserved neutral gates was justified under General Electric and Carrier. For this reason, the Union urges that the Board erred in applying the third Moore Dry Dock criteria, i.e., that "the picketing is limited to places reasonably close to the location of the situs," rather than the "related work" standards set forth by the Supreme Court in General Electric, 366 U.S. 667, 81 S.Ct. 1285, and Carrier, 376 U.S. 492, 84 S.Ct. 899. We do not agree.
 
 A.
 
 20
 We are not persuaded that the Union's actions in picketing irrespective of the location at the Santa Fe property and handbilling at the Santa Fe facility can be deemed a permissible primary boycott, just because neutral employees perform work necessary to the normal operations of the primary employer. Rather, we find the reasoning of the Fourth Circuit in Kinty v. United Mine Workers of America, 544 F.2d 706 (4th Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977), compelling. In Kinty, the Fourth Circuit held that neither General Electric nor Carrier applies to picketing away from or not "proximate" to the primary employer's premises, because:
 
 
 21
 What the Court was seeking to do in both [General Electric and Carrier] was to establish a rule for determining when picketing of employees entering the struck facility by a gate leading into the facility, reserved for the exclusive use of third-party employees of third-parties, becomes primary picketing. It was only in that context that the court used the type of work being performed by the employees of the third-parties entering the struck facility as the criterion for determining whether the picketing was primary or secondary. It follows that these cases can in no way be deemed authority for [the union's] position.
 
 
 22
 Id. at 715; accord Building and Const. Trade Council (Markwell and Hartz), 155 N.L.R.B. 319, 323-26 (1965), enf'd, Markwell and Hartz, Inc. v. N.L.R.B., 387 F.2d 79, 83 (5th Cir.1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).
 
 
 23
 The union activity at issue in Kinty involved indiscriminate picketing not only of the coal operations of the employers whose employees the Union was seeking to organize and with whom alone the union had a labor dispute, but the Union also sought to close down any coal activity or movement in the entire area. Among other holdings, the Kinty court addressed the off-site picketing of the mine workers, and held that it was not protected primary picketing.
 
 
 24
 The Union's argument, if sustained in the instant case, would, as the Fourth Circuit found in Kinty, "render the statute powerless to protect against conduct Congress clearly intended to prohibit." See 544 F.2d at 715. The rule proposed by the Union in the instant case "would mean that the location of the picketing would be of no significance in determining whether the picketing was allowable primary picketing or forbidden secondary picketing. So long as the neutral employer rendered services relating to the primary employer's 'day-to-day operations,' picketing of his employees anywhere, would under this theory, be primary picketing." Id.
 
 
 25
 In Kinty, such a rule would have meant that "the utility which provided power for the struck plant could be picketed at the power plant miles away from the situs of the labor dispute and its employees be induced thereby to discontinue work without implicating the statute." Id. Here, it would mean that the Union could, with impunity, " 'induce or encourage the employees of [Santa Fe, UPS, and other neutral employers] to engage in a strike or a concerted refusal in the course of their employment.' " See General Electric, 366 U.S. at 672, 81 S.Ct. at 1288 (citation omitted). Such a result would directly contravene one of the fundamental purposes of section 8(b)(4) of the Act.
 
 B.
 
 26
 The secondary boycott provisions of the Act reflect "the dual congressional objective of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." N.L.R.B. v. Denver Bldg. and Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). Contrary to the Union's argument, the place of picketing has always been an important issue in resolving the inherent tension between these dual congressional objectives. See Carrier, 376 U.S. at 499, 84 S.Ct. at 904; General Electric, 366 U.S. at 680, 81 S.Ct. at 1293; Kinty, 544 F.2d at 713-14 and n. 13. Indeed, among the requirements of the Moore Dry Dock test--explicitly approved by the Supreme Court in General Electric--is the requirement that the picketing be limited to places "reasonably close to the situs." 92 N.L.R.B. at 549.
 
 
 27
 Neither General Electric nor Carrier supports the Union's position that the "related work" test applies within the context of this case, and we can conceive of no principled basis for expanding the standards of General Electric and Carrier to encompass the situation presented here, i.e., picketing at sites on the premises of a neutral employer, which sites are not reasonably proximate to the struck facility. Here, the Union readily acknowledges that it appealed directly to Santa Fe's employees and customers to honor the Union picket line although it had no labor dispute with Santa Fe or other neutral employers at the Richmond facility. Adopting the Union's argument would eviscerate the intent of Congress to shield neutral employers from labor disputes that are not their own. The rule proposed by the Union runs counter to our own jurisprudence, see, e.g., Iron Workers Dist. Council, Local 29, 913 F.2d at 1475 (1990) (applying Moore Dry Dock criteria to determine whether picketing on secondary employer's premises is primary or secondary); Carpenters Local 470 v. N.L.R.B., 564 F.2d 1360, 1362 (9th Cir.1977) (related-work test not intended for common situs construction projects), and that of our sister circuits. See, e.g., Kinty, 544 F.2d 706; Riverside Coal Co. v. United Mine Workers of America, 410 F.2d 267, 272-73 (6th Cir.) (refusing to apply related-work doctrine of General Electric and Carrier to union appeals to independent haulers not proximate to the struck mines), cert. denied, 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969).
 
 IV.
 
 28
 As we previously observed, the ALJ and the Board found that the Union had not complied with the third Moore Dry Dock criteria, namely, that the picketing take place reasonably close to the situs. See 92 N.L.R.B. at 549. This finding creates an inference that the Union's activity was secondary. Iron Workers Dist. Council, Local 29, 913 F.2d at 1476. Because the Moore Dry Dock rule is an evidentiary tool, any inference of secondary activity created by a union's noncompliance with the Moore Dry Dock standards can be refuted if the totality of the circumstances indicates that the union's objective was not secondary. Id.
 
 
 29
 "The secondary boycott provisions in Sec. 8(b)(4)(B) prohibit a union from inducing employees to refuse to handle goods with the object of forcing any person to cease doing business with any other person." International Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 222, 102 S.Ct. 1656, 1662, 72 L.Ed.2d 21 (1982) (footnote omitted). The Board and the ALJ found that the Union's picketing, when viewed in the context of the valid reserve gate system in effect at Santa Fe's Richmond rail terminal during the time of the picketing, warranted the inference that the Union engaged in the picketing with an objective proscribed by the secondary boycott provisions. We must enforce the Board's order if an objective of the Union in its picketing and handbilling activities at the neutral gates and other locations was unlawfully designed to enmesh neutral parties in the Union's dispute with Piggyback, even if this was not the sole object of the Union's activities. Id. at 224 and n. 21, 102 S.Ct. at 1663 and n. 21. Our independent review of the record supports the Board's finding that the Union had such an unlawful objective.
 
 A.
 
 30
 The focus of our inquiry is the object of the Union's picketing and handbilling. International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 433 v. N.L.R.B., 598 F.2d 1154, 1158 (9th Cir.1979). Because separate reserved gates were properly established, the Union had a duty to picket with restraint so as to minimize its impact on neutral employers and their employees. Allied Concrete, Inc. v. N.L.R.B., 607 F.2d 827, 830-31 (9th Cir.1979). The ALJ and the Board found that the Union had failed to comply with the Moore Dry Dock guideline by not confining its picketing-related activity to Gate 1, the primary gate established for Piggyback's employees and suppliers. Thus, if there is substantial evidence to support this finding, there is no inference of primary activity. "To the contrary, the inference is that the activity was secondary." Iron Workers Dist. Council, Local 29, 913 F.2d at 1476.
 
 
 31
 The Union does not dispute that it picketed and distributed handbills appealing to the employees of Santa Fe and other neutral employers at Gates 2, 3, 4, and 5, although these gates were designated as "neutral" gates, and were not used by Piggyback employees, customers, visitors, and suppliers. The Union also does not deny that it conducted similar activities at the UPS drop-off point, although no Piggyback employees were stationed at the drop-off point, or that it picketed trains at locations designated as the West Switching Lead and the Zone 3 Industries spurs. These concessions create a fair inference that the Union's objective was secondary. International Ass'n of Bridge, etc., Workers, 598 F.2d at 1158.
 
 
 32
 The Union attempts to justify its picketing and appeals to employees of neutral employers as a primary boycott on the ground that Santa Fe and its customers are "suppliers" of Piggyback. It is true, as the Union argues and the Board acknowledges, that a union at a common situs may picket the primary employer's supplier, i.e., any employer that delivers materials for the direct use of the primary employer in the normal course of its business. See J.F. Hoff Elec. Co. v. N.L.R.B., 642 F.2d 1266, 1274 (D.C.Cir.1980), cert. denied, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); accord Iron Workers Local 433, 294 N.L.R.B. 182, 183, 1989 WL 224027 (1989). The Union errs, however, in characterizing Santa Fe and other neutral employers as "suppliers" of Piggyback merely because they move intermodal freight into a position that enables Piggyback to transfer it between Santa Fe's flatcars and the trucks of Santa Fe's customers.
 
 
 33
 The test applicable to picketing of direct suppliers of primary employers is not as broad as General Electric's related-work test. Hoff, 642 F.2d at 1272-73 and n. 7. The right to picket a "supplier" applies only where the other employer's goods or services are for the direct and exclusive use of the primary employer. Id. at 1275. In this case, the Board affirmed the ALJ's findings that:
 
 
 34
 [T]he intermodal freight delivered to Piggyback was not supplied for the purpose of having Piggyback's employees "use" the freight; that is, to load or unload the intermodal freight onto and off of the railroad flatcars. Rather, the outgoing intermodal freight was supplied to Piggyback's employees by the neutral truckers for Santa Fe's "use"; for Santa Fe to transport to its destination. The incoming intermodal freight was supplied to Piggyback's employees by Santa Fe's employees for Santa Fe's customers' "use"; for delivery to Santa Fe's customers by the customers' truckers. Therefore, considering the context of the delivery of the intermodal freight to Piggyback's employees, it is clear that neither Piggyback, nor Santa Fe, nor Santa Fe's customers, nor Santa Fe's customers' truckers, considered Santa Fe's customers or Santa Fe's employees to be suppliers of Piggyback....
 
 
 35
 [E.R. at 33.] The finding that Santa Fe and its customers were not Piggyback's "suppliers" is amply supported by the record. Since the Union acknowledged that it had picketed at Gates 2, 3, 4, 4(b), and 5, the West Switching Lead and Zone 3 Industries spurs, and the UPS drop-off point, the Board's finding that the Union was engaged in unlawful secondary picketing, in violation of Secs. 8(B)(4)(i) and (ii)(B) of the Act, was warranted.
 
 B.
 
 36
 The unlawful secondary object of the Union's picketing is further evidenced by the Union's appeals to neutral employees to respect the Union's picket line at the Richmond facility, and also by the Union's appeals to Santa Fe's employees to refuse to do any part of their daily work which involved Piggyback's operation. Those appeals were contained in handbills distributed by Union picketers at Gates 2, 3, 4, 4(b), and 5, reserved for the neutral employers, and are reflected in letters sent by the Union to Santa Fe's management, to Santa Fe's largest customer at the Richmond terminal, UPS, to the unions representing Santa Fe's Richmond terminal employees, and to Santa Fe's lawyer. The record reveals that:
 
 
 37
 At Gate 3, the Union distributed handbills addressed, "TO DRIVERS ENTERING THE RAIL YARD," appealing to the truck drivers entering at this location with the following request:
 
 
 38
 Teamsters Local 315 is asking you to respect our picket line against Piggy Back [sic] Services, Inc.
 
 
 39
 If you are here to pick up or drop a trailer, you will be dealing directly with employees of Piggy Back Services, Inc. We are asking you not to do that.
 
 
 40
 If you are a Teamster, you have a right under your Union contract not to do business with this unfair employer. If you are not a Union member, you still have legal rights.
 
 
 41
 [E.R. at 12.] The Union also wrote a letter to UPS, Santa Fe's largest customer for intermodal freight at the Richmond rail terminal, explaining the picketing at Gate 3 in the following manner:
 
 
 42
 The picketing is presently being relocated at the gate where UPS drivers normally enter the rail yard to pick up and deliver trailers. The pickets will be appealing to all drivers entering the premises who do business directly with Piggy Back Services, Inc., to refuse to perform any work directly related to the Piggy Back Services, Inc. operation.
 
 
 43
 The present work operation ... requires drivers entering the premises to deal directly with the employer performing the ramping and deramping services (now Piggy Back Services, Inc.) as a part of the pick up and/or delivery of trailers. Piggy Back Services, Inc. is the primary employer involved in this labor dispute, and Local 315 is entitled to request other employees to honor our picket line against this Employer by refusing to work directly with its personnel.
 
 
 44
 [E.R. at 12-13.]
 
 
 45
 At Gate 5, handbills distributed by the Union were addressed, "TO EMPLOYEES WORKING IN SANTA FE RAILWAY YARD," and read in pertinent part:
 
 
 46
 We are asking you to refuse to deliver railcars to Piggy Back employees to work on, refuse to work with Piggy Back employees, and refuse to perform switching services to enable Piggy Back employees to do their work. We are not asking you to cease any work unrelated to Piggy Back's day-to-day operations.
 
 
 47
 [E.R. at 13.] Similarly-worded handbills were distributed to Santa Fe's employees at Gates 2, 4 and 4(b).
 
 
 48
 Additionally, the Union sent letters to the presidents of seven unions that represent Santa Fe's employees employed at the Richmond rail terminal. These letters informed the union presidents of the Piggyback labor dispute, and stated:
 
 
 49
 We have been sanctioned by the International Brotherhood of Teamsters to picket Piggyback Services and we are picketing some of the entrances to the Richmond Yard. Road crews (trains) have been going through our lines both when entering and exiting the Piggyback Services, Inc. facility. We have handed out fliers (see enclosures) informing Railroad employees of our labor dispute with Piggyback Services and asking for their support and to please recognize our sanctioned picket line.
 
 
 50
 Our members have talked to some of the Railroad Union employees and have been told that they have received no instructions regarding our picket lines.... [W]e need the support and respect of our lines by other Local Unions. If you can notify your [various union members] that the Teamsters Union members at Richmond, California are engaged in a lawful and sanctioned strike and that each person has the right to honor a picket line without jeopardizing their jobs, it would be of great benefit towards a settlement with Piggyback Services, Inc.
 
 
 51
 * * * * * *
 
 
 52
 The reason for this letter is two-fold: first ...; second, to seek your assistance and cooperation in informing your members that we are on strike and to please honor our picket lines if they come in contact with our picketers.
 
 
 53
 [E.R. at 14-15.]
 
 
 54
 In concluding that the Union's picketing had an unlawful secondary objective, the Board and the ALJ further considered a letter sent to Santa Fe's lawyer by the Union's lawyer, advising that if Santa Fe would allow Union pickets inside the railyard directly adjacent to the work performed by Piggyback, "the Union will cease picketing at entrances to the yard used by employees who work with Piggyback Services in its day to day operations." [E.R. at 28.]
 
 
 55
 The content of the handbills distributed by the Union to neutral employees, and the wording of the letters sent by the Union to Santa Fe and the presidents of unions representing Santa Fe employees, support the findings of the Board and the ALJ that the Union's objective in making these appeals was unlawfully to enmesh neutral employers in its dispute with Piggyback, and not to communicate effectively with Piggyback.
 
 V.
 
 56
 Substantial evidence therefore supports the Board's conclusion that the Union violated the secondary picketing proscriptions of sections 8(b)(4)(i) and (ii)(B) by appealing to employees of neutral employers either to honor the picket line or, in the case of Santa Fe employees, not to perform work at the common situs where Piggyback conducted its normal operations. " 'Not only are the findings of the Board conclusive with respect to questions of fact ... but the Board's interpretation of the Act and the Board's application of it [even] in doubtful situations are entitled to weight.' " General Teamsters Local 959, State of Alaska v. N.L.R.B., 743 F.2d 734, 736 (9th Cir.1984) (quoting N.L.R.B. v. Denver Bldg. and Constr. Trades Council, 341 U.S. 675, 691-92, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951)). In light of the deference we accord decisions of the Board, we will enforce the Board's order in this case. See N.L.R.B. v. O'Neill, 965 F.2d at 1526; N.L.R.B. v. United Union of Roofers, Local 81, 915 F.2d at 510.
 
 VI.
 
 57
 The order of the Board, reported at 306 NLRB 118, will be ENFORCED. The Union's cross-petition for review will be DENIED.
 
 
 
 *
 Honorable Leonard I. Garth, United States Circuit Judge, Third Circuit Court of Appeals, sitting by designation
 
 
 [1]
 Intermodal freight traffic involves the transportation of freight in trailers and containers. These trailers and containers are transported by Santa Fe on railroad flatcars. Approximately 40% of the train freight traffic at the Santa Fe facility is intermodal; the other "non-intermodal" freight transported by Santa Fe includes the transportation of freight in boxcars, tank cars, and auto transport cars
 
 
 [2]
 The order of the ALJ, as modified and affirmed by the Board, requires the Union to cease and desist from:
 (a) Inducing or encouraging any individual employed by Santa Fe or any other person engaged in commerce or in an industry affecting commerce to engage in, a strike or refusal in the course of his employment to use, manufacture, transport, or to otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, where an object thereof is to force or require Santa Fe, or any person engaged in commerce or in an industry affecting commerce, to cease using, selling, handling, transporting, or otherwise dealing in the products of, or to cease doing business with, Piggyback.
 (b) Threatening, coercing, or restraining Santa Fe or any other person engaged in commerce or in an industry affecting commerce, where an object thereof is to force or require Santa Fe or any other person engaged in commerce to cease using, selling, handling, transporting, or otherwise dealing in the products of, or cease doing business with, Piggyback.
 
 
 [3]
 The Act's prohibition against secondary boycotts is contained in section 8(b)(4), which makes it an unfair labor practice for a union:
 (i) to engage in, or to induce or encourage any individual employed by any person ... to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or
 (ii) to threaten, coerce, or restrain any person ... where in either case an object thereof is
 (B) forcing or requiring any person ... to cease doing business with any other person ... Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 29 U.S.C. Sec. 158(b)(4).